**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
          jwilner@bursor.com
          jglatt@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIDGET ERICKSON, individually and on behalf of all other persons similarly situated,<br><br>                   Plaintiff,<br><br>     v.<br><br>KIMBERLY-CLARK CORPORATION,<br><br>                  Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Bridget Erickson ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Kimberly-Clark Corporation ("Defendant" or "Huggies"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiff brings this class action lawsuit on behalf of herself, and all others similarly situated who purchased Huggies Simply Clean Fragrance Free baby wipes (the "Product")[1], which are unfit for their intended use because they contain, or risk containing, unsafe levels of per- and polyfluoroalkyl substances ("PFAS").  The Product is formulated, designed, manufactured, advertised, sold, and distributed by Defendant or its agents, to consumers, including Plaintiff, across the United States.

2.      PFAS are a group of synthetic chemicals known to be harmful to children.  Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, laboratory studies have shown a number of PFAS-linked toxicological effects and have been associated with thyroid disorders, immunotoxic effects, and various cancers.[2]

3.      Furthermore, the Centers for Disease Control and Prevention ("CDC") outlined a host of health effects associated with PFAS exposure, including liver damage, decreased fertility, and increased risk of asthma.[3]

---

[1] Discovery may reveal that additional of Defendant's products are within the scope of this Complaint.  Accordingly, Plaintiff reserves the right to include additional items identified through the course of discovery.

[2] *See* Alan D. Woolf, M.D., M.P.H., FAAP, & Lauren Zajac, M.D., M.P.H., FAAP., *Report Outlines Health Effects of PFAS Chemicals in Children, Provides Recommendations for Testing*, AM. ACAD. OF PEDIATRICS (Sept. 13, 2022), https://publications.aap.org/aapnews/news/22138/Report-outlines-health-effects-of-PFAS-chemicals?autologincheck=redirected.

[3] *What are the Health Effects of PFAS?*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY (Jan. 18, 2024), https://www.atsdr.cdc.gov/pfas/health-effects/index.html.

---

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4.      Independent testing conducted by Plaintiff's counsel, utilizing a Department of Defense ELAP-certified laboratory, revealed that the Product contains 305 parts of trillion (PPT) of dangerous PFAS chemicals.

5.      Accordingly, Plaintiff brings claims against Defendant individually and on behalf of a class of all others similarly situated for (1) violation of California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*.; (2) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.;* (3) violation of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.;* (4) Breach of Express Warranty; and (5) Unjust Enrichment.

## **PARTIES**

6.      Plaintiff Bridget Erickson is a citizen of California who resides in Ukiah, California. Plaintiff Erickson purchased the Product in April 2024 from a Safeway store in California for use on her children.  Prior to her purchase, Plaintiff Erickson reviewed and relied on Defendant's representations, labeling, and packaging, and saw that the Product was warranted as safe for infants, babies, and toddlers and made with "simply clean," "gentle ingredients."  Plaintiff Erickson saw these representations prior to and at the time of purchase and understood them as representations and warranties that the Product was suitable as a safe baby wipe for babies and toddlers.  Accordingly, Plaintiff Erickson relied on these representations and warranties in deciding to purchase the Product.  As such, those representations and warranties were part of the basis of the bargain.  In making her purchase, Plaintiff Erickson paid a price premium due to the false and misleading claim that the Product is a safe and suitable baby wipe for regular application to babies despite the presence (or risk thereof) of toxic PFAS chemicals in the Product.  Had Plaintiff Erickson known that the Product contained, or risked containing, dangerous levels of toxic PFAS chemicals, and therefore was not composed of "gentle" ingredients and safe for young children when used as intended, Plaintiff Erickson would not have purchased the Product or would have purchased it under substantially different terms.  Plaintiff Erickson did not receive the benefit of her bargain because the Product was not, in fact, safe for use as intended because of the inclusion (or risk) of PFAS chemicals.

7.      Plaintiff Erickson remains interested in purchasing the Product from Defendant. However, she is unable to determine if the Product is actually safe for use on infants, babies, and toddlers.  She understands that the composition of the Product may change over time, but as long as Defendant continues to represent the Product as being composed of "simply clean" and "gentle ingredients" and suitable for everyday use on young children, when presented with false or misleading information while shopping, she will be unable to make informed decisions about whether to purchase the Product and will be unable to evaluate the different prices between Defendant's Product and competitors' products.  Plaintiff Erickson is further likely to be repeatedly misled by Defendant, unless and until Defendant is compelled to ensure that the Product's marketing as "simply clean" and made with "gentle" ingredients and therefore safe for young children, is, in fact, true.

8.      Defendant Kimberly-Clark Corporation ("Huggies" or "Defendant") is a corporation with its principal place of business in Irving, Texas.  Defendant markets, sells, and distributes the Product throughout the contiguous United States, including in California.  Defendant manufactured, marketed, and sold the Product at issue at all times during the relevant class period.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because there are more than 100 Class Members, the aggregate claims of all members of the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and at least one Class Member is a citizen of a state different from Defendant.

10.     This Court has personal jurisdiction over Defendant because Defendant purposefully availed itself to the benefits of doing business in this District by selling the Product to consumers in this District.  This Court also has personal jurisdiction over Defendant because a substantial portion of the events giving rise to Plaintiff's claims occurred in this District.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this District and Plaintiff Erickson resides in this District.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**FACTUAL ALLEGATIONS**</u>

**I.        Defendant's Baby Wipes**

12.        Defendant manufactures, markets, and sells the Huggies Simply Clean Fragrance Free Baby Wipes in brick-and-mortar stores and online through sites like Amazon, Walmart.com, and Huggies's website.

13.        In brick-and-mortar stores, the Product's packaging represents the Product as "simply clean," prominently displaying that the wipes are "great for [use on] baby's hands, face, [and] bottom." These claims are reiterated multiple times throughout the Product packaging. The claims that the Product is "simply clean" and "great" for use on a baby's body works to reassure consumers that the Product is harmless and perfectly safe for children. The back of the Product packaging includes claims in another conspicuous red text box that the Product is "Hypoallergenic," "Dermatologically Tested," "Alcohol Free," and "Paraben Free." These claims are followed by a list of the purported contents of the Product, described by Defendant as "Gentle ingredients." Nowhere on this list of "gentle ingredients," is listed any compound of PFAS or risk that the Product may contain them.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15





16    14.    In addition, on Defendant's website, the Product is advertised as "[h]ypoallergenic

17  and unscented …[to] help keep baby's skin clean and healthy."[4]  Defendant further markets the

18  Product as "plant-based" and "great for everyday use."[5]  On Defendant's Product page, these

19  claims are presented with images of a smiling mother using the wipes to clean her baby, as well as

20  an image of a seemingly happy, healthy baby, whose face is being wiped with the Product.

21
22
23  ────────────────
    [4] Huggies.com, *Huggies Simply Clean Fragrance Free Baby Wipes*, available
24  https://www.huggies.com/en-us/wipes/simply-
    clean?gclsrc=aw.ds&&utm_source=google&utm_medium=cpc&utm_campaign=Brand_Wipes_Si
25  mplyClean_Exact&utm_content=Ad&utm_term=huggies%20simply%20clean%20baby%20wipes
    &maas=maas_adg_api_7140611940801_macro_1_1&ref_=aa_maas&aa_campaignid=209697834
26  12&aa_adgroupid=156913123814&aa_creativeid=ad-689038268787_kwd-308931483833_dev-
    c_ext-
27  &tag=maas&gad_source=1&gclid=Cj0KCQjwr9m3BhDHARIsANut04ZjIkEyFd0NjGZ5JTROiIF
    -Qn3NAmFMIm0x5Y2tTyLyoWbldKnRAAgaAs3DEALw_wcB&gclsrc=aw.ds
28  [5] *Id.*

────────────────

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17   15.   By marketing the Product as "simply clean," and made with "gentle ingredients"

18   while including images of seemingly healthy babies, Defendant leads consumers to understand the

19   Product's utility as a safe, clean, toxin-free baby wipe—as any parent would expect—for daily use

20   on their young children.  Indeed, Defendant asserts that the Product is "great for everyday use."

21   However, nowhere on the Product packaging or Product description does Defendant clarify that the

22   Product contains, or risks containing, toxic PFAS chemicals.  But, Defendant's description of the

23   Product's utility as a safe-to-use baby hygiene product is contrary findings that the Product

24   exposes, or risks exposing, children, infants, and babies to high levels of PFAS.

25   16.   Indeed, on Defendant's website, it features a list of all the purported ingredients and

26   an explanation for the purpose of each ingredient's inclusion.  Defendant claims that consumers'

27   "baby's skin is [its] priority.  That's why [it] carefully select[s] each ingredient that goes into" the

28   Product.  Notably missing from this list is the mention of PFAS or PFAS-compounds.

1    17.    In fact, Defendant's representations on Amazon expressly warrant that the Products

2   are "plant-based."



18.    As evident by a popular parent-blog New Modern Mom, which averages 51,400

monthly visits, consumers are "pretty specific about selecting non-toxic diapers and natural baby

wipes made with organic ingredients."[6]  To that end, reasonable consumers (*e.g.,* parents with

infants, babies and young children) understand representations like "gentle" to refer to "[n]on-toxic

wipes … specifically designed with your baby's delicate skin in mind, utilizing only gentle, non-

irritating ingredients."[7, 8]

---

[6] Barbara Mighdoll, *Non-Toxic Baby Wipes Guide (And Ones To Avoid)*, New Modern Mom (Apr. 1, 2024) *available* https://newmodernmom.com/blog/non-toxic-baby-wipes/.

[7] *Id.*

[8] *See also* HCHW Writers, *How to Choose Non-Toxic Baby Wipes: Free Guide & Tips 2024*, (Oct. 19, 2023) Healthychild.org, *available* https://healthychild.org/health/non-toxic-baby-wipes ("When choosing organic baby wipes, prioritize baby products that contain natural ingredients, such as

**II.       PFAS Chemicals Are Harmful To Babies And Infants**

19.     PFAS chemicals "are man-made chemicals that have been used in industry and consumer products worldwide since the 1940s.  They have been used to make nonstick cookware, water-repellent clothing, stain resistant fabrics and carpets, some cosmetics, some firefighting foams, and products that resist grease, water, and oil."[9]  PFAS are known as "forever chemicals" because they break down slowly, if at all, and accumulate in the human body and the natural environment.[10]  "PFAS are extremely toxic at doses as low as parts per trillion or quadrillion."[11]

20.     PFAS are often divided into two groups: long chain and short chain, both of which are toxic to humans.[12]  In fact, long chain PFAS have been banned in the European Union and phased out by major U.S. manufacturers due to their health risks.[13]  Regardless of length, research from the U.S. National Toxicology Program suggests that both long chain and short chain PFAS have similar levels of toxicity.[14]

21.     PFAS chemicals have been connected with severe and long-term health consequences.  Erika Schreder, Director of Science at Toxic-Free Future, and Jennifer Dickman, Senior Program Associate of Safer Chemicals, Healthy Families, have explained that [p]rimary

---

plant-based extracts, organic oils, and **gentle** cleansers derived from natural sources.") (emphasis added).

[9] Agency for Toxic Substances and Disease Registry, *Per= and Polyfluoroalkyl Substances (PFAS) and Your Health,* U.S. DEP'T OF HEALTH AND HUM. SERVS. (Jan. 18, 2024) *available* https://www.atsdr.cdc.gov/pfas/health-effects/overview.html#:~:text=They%20have%20been%20used%20to,grease%2C%20water%2C%20and%20oil.

[10] National Institute of Environmental Health Sciences, *Perfluoroalkyl and Polyfluoroalkyl Substances*, U.S. DEP'T OF HEALTH AND HUM. SERVS. (Dec. 4, 2023), https://www.niehs.nih.gov/health/topics/agents/pfc.

[11] Jeffrey Kluger, *All The Stuff In Your Home That Might Contain PFAS 'Forever Chemicals*, Time (May 19, 2023) *available* https://time.com/6281242/pfas-forever-chemicals-home-beauty-body-products/.

[12] National Institute of Environmental Health Sciences, *supra* note 10.

[13] *Per- and Polyfluoroalkyl Substance (PFAS)*, AM. WATER WORKS ASS'N (Aug. 12, 2019), https://www.awwa.org/Portals/0/AWWA/ETS/Resources/Per-andPolyfluoroalkylSubstances(PFAS)-OverviewandPrevalence.pdf?ver=2019-08-14-090234-873..

[14] Nat'l Toxicology Program, *Per- and Polyfluoroalkyl Substances (PFAS)*, NAT'L INST. OF HEALTH (Jan. 8, 2024), https://ntp.niehs.nih.gov/whatwestudy/topics/pfas

---

among [PFAS-linked health concerns] are cancer and effects on lipid metabolism, but they also include immune suppression, thyroid disease, and harm to reproduction."[15]

22.     Similarly, Dr. Lina S. Birnbaum, Scholar in Residence at Duke University, Scientist Emeritus and Former Director of the National Institute of Environmental Health Sciences (NIEH) and National Toxicology Program, stated that "[t]hese toxic chemicals are linked to serious problems like cancer, liver damage, decreased fertility, and asthma. … PFAS can [also] weaken our immune system, making us more vulnerable to infectious diseases like COVID-19."[16]

23.     Additionally, in children, PFAS has also been linked to "[l]ower antibody response[s] to some vaccines,"[17] thereby rendering children more vulnerable to disease they would otherwise be immune from.

24.     Defendant repeatedly plays up the importance of the "simply clean" properties of the Product for the consumer's baby's sensitive skin.  Defendant is correct that babies have sensitive skin.  In fact, babies have *particularly* sensitive skin.  "A newborn's skin is significantly thinner and more permeable than that of an adult and can more readily absorb chemicals."[18]  Not surprisingly then, the American Academy of Pediatrics confirm that "[c]hildren are more vulnerable to environmental pollutants like PFAS than adults because of … lower body weight, differences in water and food intake, developing organ systems and longer lifespans during which toxic effects might manifest."[19]  Accordingly, the presence of PFAS in the Product is particularly alarming, as it is designed to be used at infancy and through early childhood.

---

[15] Erika Schreder and Jennifer Dickman, *Take Out Toxics: PFAS Chemicals In Food Packaging* 1-26, 6 (2019), TOXIC FREE FUTURE, *available*, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://toxicfreefuture.org/wp-content/uploads/2019/05/Take-Out-Toxics-Full-Report.pdf.

[16] *New Study Indicates Toxic Chemicals Used In Take-Out Food Packaging From Popular Food Chains*, ECOLOGY CTR., https://www.ecocenter.org/new-study-indicates-toxic-chemicals-used-take-out-food-packaging-popular-food-chains.

[17] *EGLE Classroom: Introduction to PFAS*, MICH. PFAS ACTION RESPONSE TEAM, https://www.michigan.gov/pfasresponse/faq/categories/pfas-101.

[18] Sydney Swanson, *EWG's Healthy Living: Quick Tips to Safer Diapers,* ENV'T WORKING GRP., (Dec. 10, 2020) *available* https://www.ewg.org/research/guide-safer-diapers.

[19] Woolf, *supra* note 2.

25.     For that reason, wipes containing PFAS are cause for concern because "[t]he skin in the area around a baby's genitals is even thinner and more susceptible to exposure to potentially harmful chemicals."[20]  For girls, the presence of PFAS in products coming in contact with vaginal tissue adds further concern.  According to expert Alexandra Scranton, "vaginal or vulvar tissue [is] much different and more sensitive than the skin on the rest of [the] body."[21]  This is because "[t]he walls of the vagina are filled with numerous blood vessels and lymphatic vessels, which allow for direct transfer of chemicals into the circulatory system."[22] Accordingly, "[c]hemicals absorbed through the vagina are easily and effectively distributed throughout the body, without being metabolized."[23]

26.     Moreover, according to Jessica Singh of Columbia University's Mailman School of Public Health, "the vagina is an effective delivery route of drugs to the systemic circulation system, suggesting that it could also effectively deliver other compounds like toxic chemicals, to the circulation."[24]  "This is due to the abundance of arteries, blood and lymphatic vessels in the walls of the vagina mucosa, and the fact the absorption through this route bypasses first-pass metabolism, by directly entering the peripheral circulation."[25]  "For instance, vaginal administration of estradiol results in significantly higher blood serum levels compared to oral administration.  Furthermore, vulvar and vaginal tissues are more hydrated and permeable compared to the skin on the rest of the body, which may make these more susceptible to chemical exposure.  Moreover, in addition to systemic exposure, vaginal exposure to chemicals and drugs can also have local effects on vaginal and cervical tissue."[26]

---

[20] Sydney Swanson, *supra* note 18.

[21] Alexandra Scranton, *Chem Fatale: Potential Health Effects of Toxic Chemicals in Feminine Care Products*, 9 WOMEN'S VOICES FOR THE EARTH 4 (2013), https://womensvoices.org/wp-content/uploads/2013/11/Chem-Fatale-Report.pdf.

[22] *Id.*

[23] *Id.*

[24] Jessica Singh, et al., *Tampon Use, Environmental Chemicals and Oxidative Stress in the BioCycle Study*, 18:11 ENV'T HEALTH, 1-9, 2 (2019)

[25] *Id.*

[26] *Id.*

---

27.     The health risk to infants and babies using wipes with PFAS chemicals becomes even more alarming when understood how frequently they are exposed to those chemicals through ordinary use.  "While it might make you gasp, [a parent will] need about 10,000-12,000 baby wipes yearly."[27]  Each application is a repeated, direct exposure to a small and vulnerable body.

28.     Accordingly, for both boys and girls, this repeated, high, and direct skin exposure creates a severe risk to the baby.  For context, researchers studying the effects of *low* level, repeated exposure of certain PFAS chemicals on the skin of rodents showed "significantly reduced levels of antibodies," demonstrating that PFAS had been absorbed through the skin.[28]

29.     As such, direct PFAS exposure to infants and babies from Defendant's wipes, even if they contain low levels, especially when intended for "everyday use" pose a health risk, the likes of which Plaintiff and Class Members sought to avoid by purchasing Defendant's "simply clean," and purportedly toxin-free Products for their babies.

30.     Despite Defendant's claims that the Product is made from "clean" and "gentle" ingredients purportedly safe on a baby's sensitive skin, and therefore free from certain harmful chemicals, like alcohol and parabens, Defendant omits the fact that its Product contains or risks containing, toxic, PFAS chemicals.

31.     Plaintiff and the members of the Classes bargained for a product that is "simply clean," that is nontoxic, that does not pose a risk to their young children, and so made free from harsh and dangerous ingredients.  Plaintiff and the Class Members were thus deprived of the basis of their bargain when Defendant sold them a Product—intended to be used daily on babies—that contained, or risked containing, high levels of toxic PFAS chemical, thereby exposing their babies to potentially severe health consequences.

32.     No reasonable consumer would expect the Product, marketed prominently as a baby product made with "plant-based," "gentle ingredients" and free from other harmful chemicals to

---

[27] Kelly O'Lone, *How Many Baby Wipes You Need – Day/Week/Month/Year Breakdown*, THE PLACE FOR PARENTS, available https://theplaceforparents.com/how-many-baby-wipes-do-i-need/.

[28] Ketura Persellin, *Study: PFAS Exposure Through Skin Causes Harm Similar to Ingestion*, ENV'T WORKING GRP. (Jan. 13, 2020) available https://www.ewg.org/news-insights/news/study-pfas-exposure-through-skin-causes-harm-similar-ingestion.

contain non-natural, harmful, toxic PFAS chemicals.  Accordingly, Plaintiff and the members of the Classes suffered economic injuries as a result of purchasing the Product.

33.    In fact, the White House recently announced a plan to take aggressive action to tame peoples' exposure to PFAS chemicals by directing the Environmental Protection Agency to create "the first-ever national legally enforceable drinking water standard for PFAS, which will protect 100 million people from PFAS exposure, prevent tens of thousands of serious illnesses, and save lives."[29]  As President Biden pointedly explained "[PFAS are] dangerous, and my administration is addressing them.  The @EPA is issuing … $1 billion from my agenda to help states detect and treat this pollutant."[30]

34.    Accordingly, because the facts concern a critical safety-related deficiency in the Product, Defendant was under a continuous duty to disclose to Plaintiff and the members of the Classes the true standard, quality, and grade of the Product and to disclose the Product contained— or risked containing—substances known to have adverse health effects.  Defendant also had a duty to disclose because of its exclusive and/or superior knowledge concerning the true nature and composition of the Product as the owner, manufacturer, producer, marketer, and seller of the Product.  Nonetheless, Defendant concealed this material information and represented the opposite.

35.    Although Defendant is in the best and exclusive positions to know the true composition and contents of its Product, Plaintiff satisfied the requirements of Rule 9(b) by alleging the following facts with particularity:

36.    **WHO:**  Defendant Kimberly-Clark Corporation.

37.    **WHAT:**  Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Product contains—or risks containing—high levels of PFAS, which are widely known to have significant health repercussions.  Thus, Defendant's conduct deceived

---

[29] THE WHITE HOUSE, *Fact Sheet: Biden-Harris Administration Takes Critical Action to Protect Communities from PFAS Pollution in Drinking Water*, April 10, 2024, *available* https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/10/fact-sheet-biden-harris-administration-takes-critical-action-to-protect-communities-from-pfas-pollution-in-drinking-water/.

[30] President Biden (@POTUS), TWITTER, (April 10, 2024, 1:25 PM), https://twitter.com/potus/status/1778157253633167564?s=46&t=Re-0q0RQuNL6ltmOa2mCig.

Plaintiff and the members of the Classes into believing that the Product was safe for use on babies and infants due to its "simply clean," "plant-based," and "gentle ingredients," despite the inclusion (or risk of) harmful chemicals.  Defendant knew, or reasonably should have known, that this information is material to reasonable consumers, including Plaintiff and the members of the Classes when they make their purchasing decisions, yet Defendant continued to pervasively and affirmatively warrant and represent that the Product was of a quality and character that it is not.

38.  **WHEN:**  Defendant made material misrepresentations and omissions during the putative class period, including prior to and at the time of Plaintiff's and the Class Members' purchases, despite Defendant's knowing—or reasonably should have known—the risk that the Product contained, or risked containing, PFAS.  Plaintiff viewed the packaging and advertising of the Product sold in brick-and-mortar stores, and viewed the representations and warranties made by Defendant on the packaging and corresponding marketing, understanding them to mean that the Product is nontoxic and therefore safe for use on babies and infants' sensitive skin because it is made from "simply clean," "plant-based," and "gentle ingredients" and free from similar harmful, toxic chemicals.

39.  **WHERE:**  Defendant's marketing messages were uniform and pervasive throughout California and the United States, carried through material misrepresentations, warranties, and omissions on its labeling, packaging, and marketing materials.

40.  **HOW:**  Defendant made material misrepresentations and omissions of fact regarding the Product by representing and warranting that the Product was made of "simply clean," "plant-based," "gentle ingredients," free of toxic chemicals (or the risk therefore), and therefore safe for use on babies and infants.

41.  **WHY IT IS FALSE:**  Defendant made material representations and warranties that the Product was "simply clean" and made from "plant-based" and "gentle ingredients," despite testing revealing the presence (and risk of the presence) of toxic, PFAS chemicals.  These representations and warranties communicate to reasonable consumers that the Product is safe to use as intended—on babies and infants and does not expose them to harmful, toxic chemicals, or the risk of toxic PFAS chemicals.  However, and although consumers like Plaintiff purchased the

1  Product for the purpose of purchasing a baby wipe that posed no risk of exposing her young

2  children, the Product contained high levels of toxic PFAS chemicals, contrary to Defendant's

3  representations.

4      42.    **INJURY:**  Plaintiff and the members of the Classes purchased, and paid a premium

5  or otherwise paid more for, the Product they otherwise would not have—had they known that the

6  Product contained, or risked containing, toxic PFAS chemicals.

7  **III.    Defendant's Misrepresentations And Omissions Are Actionable**

8      43.    Plaintiff and Class Members would not have purchased the Product on the same

9  terms had they known that the Product contained or risked containing PFAS.  At worst, the Product

10  is worthless, as it is marketed as made with "simply clean," "plant-based" and "gentle ingredients,"

11  free of toxic chemicals, and safe to use on babies and infants despite containing—or risks

12  containing—dangerous levels of PFAS chemicals, thus rendering the Product unsafe for babies and

13  infants.

14      44.    Plaintiff and Class Members bargained for wipes that were made with "simply

15  clean," "plant-based" and "gentle ingredients," and therefore free of harmful toxins, and were

16  deprived of the basis of their bargain when Defendant sold them a Product containing PFAS.

17  Defendant likewise affirmatively and prominently warrants on the back packaging to consumers

18  that harmful alcohol, and parabens have been excluded from the Product, thereby implying to

19  consumers that it is free of toxic chemicals as the consumers bargained for.  In fact, parabens and

20  PFAS chemicals are so closely linked that they are often grouped together in public discourse and

21  in research, as chemicals known to be harmful to health and avoided where possible.[31]

---

22  [31] *See* Andrea Michelson, *4 Toxic Chemicals in Makeup, Shampoo, and Household Products—and How to Avoid Them*, Business Insider (Oct. 18, 2021) *available*

23  https://www.businessinsider.com/toxic-chemicals-to-avoid-makeup-shampoo-ingredient-labels-2021-10 ("PFAS, phthalates, and **parabens** are just a few of the chemical groups that have long-

24  term effects") (emphasis added); *See* Brian Bienkowski, *PFAS and Phthalate Chemical Exposure Early in Life May Hamper Kids' Lungs*, ENV. HEALTH SCI. (Feb. 6, 2019) *available*

25  https://www.ehn.org/pfas-and-phthalate-chemical-exposure-early-in-life-may-hamper-kids-lungs-2628082014.html ("Children exposed to three different chemical classes—**parabens**, phthalates

26  and perfluoroalkyl substances (PFAS)—before birth and shortly after had reduced lung function at 6 to 12 years old[.]") (emphasis added); *See* Harrison Wein, Ph.D., *Probing Personal Care*

27  *Products*, NIH NEWS IN HEALTH (Aug. 2022) *available*

28  https://newsinhealth.nih.gov/2022/08/probing-personal-care-products#:~:text=Many%20chemicals%20of%20concern%2C%20including,brain%2C%20develop

---

45.     No reasonable consumer would expect that a baby wipe marketed as being made from "simply clean," "plant-based" and "gentle ingredients," would pose a risk to health, safety, and well-being by containing dangerous levels of PFAS chemicals linked to harmful health effects in babies.  Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Product.

46.     Moreover, because these facts relate to a critical safety-related deficiency in the Product, Defendant was under a continuous duty to disclose to Plaintiff and Class Members the true standard, quality, and grade of the Product and to disclose that the Product may contain substances known to have adverse health effects.  Defendant, as manufacturer or a party to a contract to manufacture, thereby providing and approving designs of the Product, and as seller and advertiser of the Product, is best situated to know the contents of the Product.  Nonetheless, Defendant concealed and affirmatively misrepresented the true nature of the Product, as discussed herein.

47.     Likewise, Defendant is in the best position to know what content it placed on the Product's packaging and marketing materials during the relevant timeframe.  Defendant is also best positioned to know of the presence of PFAS in its Product and failed to disclose the existence, or risk of existence, of these chemicals in the Product to consumers.

## CLASS REPRESENTATIVE ALLEGATIONS

48.     ***Nationwide Class.***  Plaintiff brings this nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as:

> All persons in the United States who purchased the Product during the statute of limitations period.

49.     ***California Subclass.***  Plaintiff Erickson brings this California Subclass action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the subclass defined as:

> All persons in the State of California who purchased the Product during the statute of limitations period.

ment%2C%20and%20reproduction ("Many chemicals of concern, including phthalates, parabens, PFAS … are endocrine disruptors.").

---

50.     Unless otherwise specified, the "Class" and "Class Members" shall refer to the Nationwide Class.  The classes collectively shall be referred to as the "Classes."

51.     Excluded from the Classes are: (1) persons who made such purchases for the purpose of resale; (2) any Judge or Magistrate presiding over this action and any members of their families; (3) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiff's counsel and Defendant's counsel.

52.     ***Numerosity.***  At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclass ("Class Members" or "Subclass Members").  However, given the nature of the claims, Plaintiff believes that Class and Subclass Members are so numerous that joinder of all members is impracticable.

53.     There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and fact common to members of the Class and Subclass that predominate over questions that may affect individual Class Members include:

(a)     Whether the Product contained PFAS;

(b)     Whether a reasonable consumer would understand Defendant's marketing and packaging to understanding that the Product would be free of harmful, toxic chemicals like PFAS;

(c)     Whether Defendant misrepresented and/or failed to disclose material facts concerning the Product;

(d)     Whether Defendant had a duty to disclose the presence of PFAS in its Product;

(e)     Whether the Product posed a health risk to children and babies thereby rendering it unsafe for its intended use;

(f)     Whether Defendant's conduct was unlawful;

(g)     Whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class and Subclass;

(h)     Whether Plaintiff, the Class, and Subclass sustained damages with respect to common law claims asserted, and if so, the proper measure of those damages.

54.     With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendant violated California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*.; California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.,* and California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

55.     ***Typicality.***  The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like other members of the Class and Subclass, purchased the Product relying on the representations and warranties made by Defendant on the Product's packaging that the Products were made with "simply clean," "plant-based" and "gentle ingredients," and therefore nontoxic and safe for use on their babies and young children.

56.     ***Adequate Representation.***  Plaintiff is an adequate representative of the Class and Subclass because her interests do not conflict with the interests of the Class Members they seek to represent and have retained competent counsel experienced in prosecuting class actions, who intend to prosecute this action vigorously.  The interests of the Class Members will be fairly and adequately protected by Plaintiff and her counsel.

57.     ***Superiority.***  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the members of the Class and Subclass.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

<u>COUNT I</u>
**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**California Civil Code §§ 1750, *et seq.***
**(On Behalf of the Nationwide Class and California Subclass)**

58.     Plaintiff Erickson incorporates the foregoing allegations as if fully set forth herein.

59.     Plaintiff Erickson brings this claim individually and on behalf of the Nationwide Class and California Subclass against Defendant.

60.     Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…"

61.     Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that the goods are of a particular style or model, if they are of another."

62.     Civil Code § 1770(a)(9) prohibits "advertising goods … with the intent not to sell them as advertised."

63.     Defendant violated Civil Code §§ 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as being made from "simply clean," "plant-based" and "gentle ingredients," and safe to use on babies when the Product contained or risked containing, high levels of toxic, unsafe PFAS chemicals.

64.     Defendant failed to disclose that the Product contains or risked containing PFAS.

65.     Defendant had exclusive knowledge and/or superior knowledge of the health risks of the Product, which was not known to Plaintiff or the Classes.

66.     Defendant made material misrepresentations about the Product to Plaintiff and the members of the Classes while suppressing the true nature of the Product.  Specifically, by displaying that the Product was made from "simply clean," "plant-based," "gentle ingredients" in its advertising, and displaying that the Product is "hypoallergenic…[to] help keep baby's skin clean and healthy," when the Product actually contained harmful, toxic PFAS chemicals, Defendant affirmatively and materially misrepresented the Product.

67.     Plaintiff and the Classes have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Product that they otherwise

would not have incurred or paid and were unknowingly exposing (or risked exposing) their children to significant and substantial health risks.

68.     On April 22, 2024, prior to the filing of this complaint, Plaintiff's counsel sent Defendant a CLRA notice letter via certified mail (with return receipt requested), which complies in all material respects with California Civil Code § 1782(a).  The letter advised Defendant that it was in violation of the CLRA with respect to the presence of PFAS in the Product and demanded that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.

69.     Defendant failed to remedy the issues raised by the notice letter.

70.     Pursuant to Civ. Code § 1780, Plaintiff and the Classes seek: (a) actual damages in an amount to be determined at trial; (b) an order enjoining Defendant from continuing its violative acts and practices; (c) restitution of all money and property lost by Plaintiff and the members of the Classes as a result of Defendant's unlawful conduct; (d) punitive damages; (e) any other relief that the Court deems proper; and (f) attorneys' costs and fees.

**COUNT II**
**Violation of California's Unfair Competition Law**
**Cal. Bus. Code §§ 17200, *et seq.***
**(On Behalf of the Nationwide Class and California Subclass)**

71.     Plaintiff Erickson incorporates the foregoing allegations as if fully set forth herein.

72.     Plaintiff Erickson brings this claim individually and on behalf of the Nationwide and California Subclass against Defendant.

73.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

74.     Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** by violating the CLRA, Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9) as well

as by violating California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.

75.   In addition, as described more fully above, Defendant's misleading marketing, advertising, packaging, and labeling of its Product is likely to deceive reasonable consumers.  In addition, Defendant has committed unlawful business practices by, *inter alia*, making the presentation and omission of material facts, as set forth more fully above, thereby violating the common law.

76.   Defendant has also violated the UCL's prohibition against engaging in **Unfair Business Practices.**  Defendant's acts, omissions, misrepresentations, practices, and nondisclosures as alleged herein also constitutes "unfair" business acts and practices within the meaning of Bus. & Prof. Code §§ 17200, *et seq.*, as the conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

77.   There were reasonably available alternatives to further Defendant's legitimate business interest, other than the conduct described above.

78.   Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices.**  Defendant's claims, nondisclosures, and misleading statements with respect to the Product as more fully set forth above, were false, misleading, and/or likely to deceive the consuming public within the meaning of Bus. & Prof. Code § 17200.

79.   Plaintiff Erickson and the members of the Classes suffered a substantial injury by virtue of buying the Product that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the inclusion of harmful toxins in the Product.

80.   There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Product.

81.   Plaintiff Erickson and the Members of the Classes had no way of reasonably knowing that the Product they purchased was not marketed, advertised, packaged, or labeled in

1    conformity with Defendant's representations.  Thus, they could not have reasonably avoided the

2    injury each of them suffered.

3        82.    The gravity of the consequences of Defendant's conduct, as described above,

4    outweighs any justification, motive, or reason therefore, particularly considering the available legal

5    alternatives which exist in the marketplace.  Such conduct is immoral, unethical, unscrupulous,

6    offends established public policy, or is substantially injurious to Plaintiff Erickson and the other

7    Members of the Classes.

8        83.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff Erickson and the Classes seek

9    an order of this Court that includes, but is not limited to, requiring Defendant to (a) provide

10   restation to Plaintiff Erickson and the other Class Members; (b) disgorge all revenues obtained as a

11   result of violations of the UCL; and (c) pay Plaintiff Erickson's attorneys' fees and costs.

**COUNT III**
**Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(On Behalf of the Nationwide Class and California Subclass)**

15       84.    Plaintiff Erickson incorporates the foregoing allegations as if fully set forth herein.

16       85.    Plaintiff Erickson brings this claim individually and on behalf of the Nationwide

17   Class and California Subclass against Defendant.

18       86.    Defendant's acts and practices, as described herein, have deceived, and are likely to

19   continue to deceive, members of the Nationwide Class, California Subclass, and the public.  As

20   described throughout this complaint, Defendant misrepresented the Product as being made with

21   "simply clean," "plant-based" and "gentle ingredients" and thus safe for use on a baby's sensitive

22   skin, thereby giving the impression to reasonable consumers that the Product is safe to use as

23   intended.  However, the Product is not, in fact, safe to use on babies and small children as it

24   contains, or risks containing, unsafe PFAS chemicals.

25       87.    By its actions, Defendant disseminated uniform advertising regarding the Product to

26   and across California and the United States.  The advertising was, by its very nature, unfair,

27   deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code §§ 17500, *et seq.*

28   Such advertisements were intended to and likely did deceive the consuming public.

88.     The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the Product contains—or risks containing—substances that pose a significant risk to consumers' health.

89.     Defendant continues to misrepresent to consumers that the Product is safe for "everyday use" since it is made with "simply clean," "plant-based" and "gentle ingredients," when, in fact, the Product contains—or risks containing—harmful, synthetic, toxic PFAS chemicals.

90.     In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Plaintiff Erickson and the Members of the Classes based their purchasing decisions on Defendant's omitted material facts.  The revenue attributable to the Product sold in those false and misleading advertisements likely amounts to millions of dollars.  Plaintiff Erickson and the Members of the Classes were injured in fact and lost money and property as a result.

91.     The misrepresentation and non-disclosures by Defendant and the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.*

92.     As a result of Defendant's wrongful conduct, Plaintiff Erickson and the Members of the Classes lost money in an amount to be proven at trial.  Plaintiff Erickson and the Members of the Classes are therefore entitled to restitution as appropriate for this cause of action.

93.     Plaintiff Erickson and the Classes therefore seek (a) all monetary and non-monetary restitution allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; (b) declaratory relief; (c) reasonable attorneys' fees and costs under California Code Civ. Proc. 1021.5; (d) injunctive relief, and other appropriate equitable relief.

### COUNT IV
**Breach of Express Warranty**
**(On Behalf of the Nationwide Class)**

94.     Plaintiff hereby incorporates the foregoing allegations as if fully set forth herein.

1    95.    Plaintiff brings this claim individually and on behalf of the Nationwide Class under

2    the laws of California.

3    96.    Plaintiff and the members of the Nationwide Class formed a contract with

4    Defendant at the time of Plaintiff's and the Nationwide Class members' purchase.

5    97.    The terms of the contract include the promises and affirmations of fact made by

6    Defendant on the Product's packaging and through its marketing and advertising, as described

7    above.

8    98.    This labeling, marketing, and advertising constitutes express warranties and became

9    part of the basis of the bargain and part of the standardized contract between Defendant, Plaintiff,

10   and the members of the Nationwide Class.

11   99.    As set forth above, Defendant purports, through its advertising, labeling, marketing,

12   and packaging, to create express warranties that the Product is comprised of "simply clean," "plant-

13   based" and "gentle ingredients," and is therefore free of toxic chemicals.

14   100.   Defendant breached its express warranties about the Product and its qualities

15   because, despite its warranties concerning its "simply clean," "gentle ingredient" composition, the

16   Product is (or risks) being objectively not.  Thus, the Product did not conform to Defendant's

17   affirmations and promises as described above.

18   101.   Plaintiff and the members of the Nationwide Class would not have purchased the

19   Product had they known the true nature of the Product.

20   102.   As a result of Defendant's breach of express warranty, Plaintiff and the members of

21   the Nationwide Class suffered, and continue to suffer, financial damage and injury, and are entitled

22   to all damages, in addition to costs, interests and fees, including attorneys' fees.

23   103.   On April 22, 2024, prior to the filing of this Complaint, Plaintiff's counsel sent

24   Defendant a notice appraising Defendant of its breach of express warranties.  The letter complied

25   in all respects with U.C.C. §§ 2-313, 2-314, and 2-607.

26

27

28

**COUNT V**
**Unjust Enrichment**
**(On Behalf of the Nationwide Class)**

104.    Plaintiff hereby incorporates the foregoing allegations as if fully set forth herein.

105.    Plaintiff brings this claim individually and on behalf of the Nationwide Class under the laws of California.

106.    To the extent required by the law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

107.    Plaintiff and the Nationwide Class conferred benefits on Defendant by purchasing the Product.

108.    Defendant was unjustly enriched in retaining the revenues derived from Plaintiff and the members of the Nationwide Class.  Retention of those monies under these circumstances is unjust and inequitable because Defendant failed to disclose that the Product contained—or risked containing—toxic substances, rendering its representations that the Product is comprised of "simply clean," "plant-based" and "gentle ingredients," and thus free of toxic chemicals, false and misleading.  These omissions caused injuries to Plaintiff and the members of the Nationwide Class because they would not have purchased the Product had they known that the Product—advertised for use on babies and infants—contained or risked containing toxic, harmful PFAS chemicals.

109.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and the members of the Nationwide Class is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a)    For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiff as the representative of the Class and Subclass, and Plaintiff's attorneys as Class Counsel;

b)    For an order declaring that Defendant's conduct violates the statutes referenced herein;

c)    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

d)    For compensatory, statutory, and punitive damages in the amounts to be determined by the Court and/or jury;

e)    For prejudgment interest on all amounts awarded;

f)    For an order of restitution and all other forms of equitable monetary relief;

g)    For injunctive relief as pleaded or as the Court may deem proper;

h)    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury of all issues so triable.

Dated: October 7, 2024           **BURSOR & FISHER, P.A**.

By: _/s/ L. Timothy Fisher_

L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
        jwilner@bursor.com
        jglatt@bursor.com

*Attorneys for Plaintiff*

1

## CLRA VENUE DECLARATION

2

I, L. Timothy Fisher, declare as follows:

3

1.      I am an attorney at law licensed to practice in the State of California and a member

4

of the bar of this Court.  I am a Partner at Bursor & Fisher, P.A., counsel of record for Plaintiff.

5

Plaintiff Erickson is a resident of Ukiah, California.  I have personal knowledge of the facts set

6

forth in this declaration and if called as a witness, I could and would competently testify thereto

7

under oath.

8

2.      The Complaint filed in this action is filed in the proper place for trial under Civil

9

Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred

10

in the Northern District of California, as Plaintiff purchased the Product in this District.

11

Additionally, Defendant advertised, marketed, manufactured, distributed, and/or sold the Product at

12

issue to Class Members in this District.

13

3.      I declare under penalty of perjury under the laws of the State of California and the

14

United States that the foregoing is true and correct, and that this declaration was executed at

15

Walnut Creek, California this October 7, 2024.

16

17

    */s/ L. Timothy Fisher*    
                 L. Timothy Fisher

18

19

20

21

22

23

24

25

26

27

28